UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DARREL STONE,

                Plaintiff,

             – against –

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-----------------------------------------------------------x

**MEMORANDUM & ORDER**

14-CV-6543 (SLT)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 14 2017 ★
BROOKLYN OFFICE

**TOWNES, United States District Judge:**

      Plaintiff Darrel Stone brings this action pursuant to Section 405(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Supplemental Security Income ("SSI"). The Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (ECF No. 13). Plaintiff opposed the motion with a filing labeled "Reply Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings," (ECF No. 15), but has made no motion of his own. For the reasons set forth below, the Commissioner's motion is granted.

## I.    PROCEDURAL HISTORY

      Plaintiff filed an application for SSI on April 15, 2011. (R. 167-75). He asserted that he had been disabled since April 1, 2011, due to HIV, memory loss, and cytomegalovirus. (A.R. at 191). His application was denied on July 11, 2011, (R. 60-66), and he requested a hearing before an administrative law judge ("ALJ"), (R. 67-70). Hearing was once adjourned at Plaintiff's request so that he could secure counsel, (A.R. at 28), and ultimately held on March 6, 2013, before ALJ Lucian A. Vecchio. (A.R. at 30-59). Plaintiff, who was by then represented by Eugenie Gilmore, Esq., testified, as did Dr. Bernard Gussoff, M.D., a certified internist,

hematologist, and oncologist. (R. 30-59). ALJ Vecchio issued a decision on March 20, 2013, in which he concluded that Plaintiff was not disabled within the meaning of the Act. (R. 6-19). On September 5, 2014, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (R. 1-8). Plaintiff commenced this action on November 6, 2014, represented by the same counsel. On May 15, 2015, the Commissioner filed its motion for judgment on the pleadings pursuant to Rule 12(c). Plaintiff was given notice and opposed that motion, but nevertheless did not cross move for judgment on the pleadings. (See ECF Nos. 13-17).

## II. RELEVANT FACTS

### A. Nonmedical Evidence

Plaintiff was born in 1965, graduated high school, completed at least one year of college, and received "Job Corp" training for work as a security guard. (R. 34, 192). The record is inconsistent and otherwise unclear with respect to his employment: he worked as a security guard in or around 2001 (A.R. 182, 183-84, 192-93), worked in "stock" for a clothing manufacturer from either1985 to 1990 or 1985 to 1987 (See A.R. at 230, 236), and for a book company from 1985 to 1987 (A.R. at 236). He was previously "trained as a bricklayer." (A.R. at 213).

In his Disability Report Form SSA-3368, Plaintiff indicated two somewhat contradictory reasons for stopping work: first, the form states that he stopped working in January 2001 "[b]ecause of my condition(s) and other reasons." (A.R. at 191). The next line states "I was laid off and . . . couldn't find other work after that." (*Id.*) Roughly two years later Plaintiff testified that he had not worked in the interim but had been in a "work program, and once they found out I kept going to the doctor, and I was getting sicker and sicker, so they took me out of

the program and put me in the hospital." (A.R. at 34, 57-58). There is no other record of the referenced work program.

In his April 10, 2011 SSA application Plaintiff indicated that he was unable to work due to AIDS "memory loss," and cytomegalovirus.[1] (A.R. at 191). Plaintiff's SSA-3368 form indicated that he weighed 168 pounds (at 5'7") on April 20, 2011. (A.R at 191). His handwritten responses in a May 26, 2011 "Function Report" indicate that his daily activities include reading, watching television, "walk[ing] outside," and cooking. (A.R. at 198). He indicated that he slept poorly due to "dreams about dying" but that his condition had no effect on his ability to dress, bathe, shave, feed himself, or use the toilet. (A.R. at 198-99). He needed no special help or reminders to "take care of [his] personal needs," and he prepared meals like "meatloaf" and "fried chicken" on a regular basis. (A.R. at 199). "Sometimes" he forgot to take his medicine, but went outside every day and personally "cleaned the dishes, [did] laundry [and] ironing," but performed "no outside work." (A.R. at 199-200). He shopped for his own food and clothes "once a month [for] 2 hour[s]." (A.R. at 201). His ability to handle money was not limited and he kept his own finances. (A.R. at 201). He visited his friends once a week and his illnesses had no effect on his social activities. (A.R. at 202). He indicated that he got tired "after walking a while" and lost his breath quickly when walking stairs but had no difficulty sitting, reaching, or using his hands. (A.R. at 203.) He had "real bad [eye]sight" and would sometimes want to say something but couldn't "get the words to come out." (A.R. at 203). Sometimes he got "real bad" headaches, and sometimes he went to the store only to forget what he went there

---

[1] Later, on March 5, 2013, Plaintiff's counsel wrote to ALJ Vecchio and retracted the assertion that Plaintiff suffered from cytomegalovirus. He offered to "make a correction" and clarify that Plaintiff's "eye doctor . . . does not feel he had cytomegalorvirus [sic] retinitis." Counsel also advised that Plaintiff "did," in the past, have uveitis, and continued to experience "floaters." (A.R. at 380). As explained below, Plaintiff's treating physician had since treated and "resolved" Plaintiff's uveitis.

3

to buy in the first place. (A.R. at 205). In response to the question "How does stress or changes in schedule affect you," he responded "I get upset sometime[s]." (A.R. at 205).

Plaintiff's SSA-3367 form indicated that he had no problems hearing, breathing, concentrating, talking, sitting, standing, walking, seeing, using hands, or writing. (A.R. at 181). In an updated Disability Report completed in August of 2011 and submitted in conjunction with his administrative appeal, Plaintiff stated that his conditions had worsened: he was "increasingly forgetful," he had frequent headaches, and he "constantly [felt] fatigued." (A.R. at 207). It had "become very difficult for [him] to carry out ....daily activities such as shopping, cooking, and cleaning," and he no longer went out, "socialized, played sports, or shopped for groceries." (A.R. at 211-12). He also reported feeling "flu/cold symptoms for the past two months." (A.R. at 211).

An SSA-provided "Recent Medical Treatment" form date-stamped December 12, 2012, stated, in response to a prompt regarding what his doctors had told him regarding his condition, as follows:

> Chronic illness, full blown AIDS. [Diagnosed] 1989 stable at present with medication. Good adherence.

(A.R. at 243). It also indicated Plaintiff had recently been hospitalized at some unspecified point for pneumonia at Woodhull Hospital.

At the March 6, 2013, hearing Plaintiff testified that he was unable to work because of an HIV infection, memory loss, poor eyesight, headaches, pain, "locking up" of his arms, fatigue, and depression. (A.R. 35-42). Plaintiff also testified that he twice had pneumonia—he did not specifically state when, but the last time appears to have been in early 2011 when he first visited the emergency room and began HIV treatment. (A.R. at 39; see also A.R. at 279). He also testified that he had not sought work since April of 2011 because his arm "locked," because he suffered from headaches and foot pain, and because he had been visiting doctors "back and forth

4

. . . three times a month" and had recently received HIV medication." (A.R. at 35-37). He also testified that his weight fluctuated between 145 and 170 pounds (A.R. at 38), and that his cousin recently began delivering him groceries and helping to "clean up" because he could no longer "really do too much" on his own (A.R. at 41). He testified that he consistently had either diarrhea or constipation. (A.R. at 41). He testified both that "when I'm home I sleep all day" and that "I don't sleep that often, very easily." (A.R. at 38, 40). He said he was "never happy" and started to see a psychiatrist, one "Dr. Kahn," who prescribed him Zoloft and "sleeping pills." (A.R. at 42). He also testified, without much clarity that he had "AIDS since – HIV since 1985 with no medicine....When I went to the doctor, they told me I had AIDS diagnosis." (A.R. at 58).[2]

### B. Medical Evidence

Plaintiff's medical record, besides the consultative examinations, is primarily comprised of treatment records from (i) emergency room visits to the Interfaith Medical Center in Brooklyn made between October 2010 and March 2011, and (ii) regular outpatient visits made between March 2011 and December 2012 to the PATH Center, which provides HIV treatment and counseling at the Brooklyn Hospital.

<u>Emergency Room Visits</u>

Plaintiff's first documented treatment was in October 2010. He was admitted to the emergency room complaining of a cough and sore throat, diagnosed with Pharyngitis, and advised to "come back if it gets worse." (A.R. at 316-18). He visited the same emergency room

---

[2] The record suggests that Plaintiff was originally diagnosed as HIV positive in 1989. Notes from his treating physician in 2011 state that "he has been positive since 1989, but was in denial." (A.R. at 279). He appears to have first received HIV medication in March of 2011, one month before applying for SSI benefits. (See id.; A.R. at 58).

5

again on December 22, 2010. (A.R. at 320). The intake report from that visit indicates that he again complained of coughing and sore throat and that prior treatment led to "no improvements." (*Id.*) Severity was listed as "mild" and Plaintiff was advised to follow up in five days at the Orris G. Walker Health Center. (A.R. at 222-23). No diagnosis from this visit appears in the record, although notes indicate a respiratory infection and possible pneumonia. (A.R. at 320-24). He returned on January 11, 2011, stating that he had had a cold for 2 days, a cough, sinus pain, fever, and chills. (A.R. at 325-26). He was diagnosed with Sinusitis. (A.R. at 328). He returned again on February 8, 2011, complaining of a sore throat and diagnosed with general viral syndrome. (A.R. at 331-33). He returned again on March 15, 2011, complaining of abdominal pain and vomiting. (A.R. at 325-37). He was treated with illegibly described medication, diagnosed with gastroenteritis, and referred to an unidentified clinic, presumably the Path Center. (A.R. at 338-41).

### HIV Treatment at the Path Center

Plaintiff visited the Path Center, where he first received HIV treatment from Dr. Leonard Berkowitz, in March of 2011. (A.R. at 267). An "Initial History and Physical Examination" report from Dr. Berkowitz reported no fever, fatigue, or weight changes, nausea, vomiting, diarrhea, constipation, shortness of breath, or abdominal pain. (A.R. at 272). Plaintiff appeared "well developed and well nourished, alerted and oriented x 3 in no apparent distress." (A.R. at 274). His mood and dress were appropriate, he had "good breathe sounds bilaterally," a "nontender and nondistended" abdomen," and a normal anal sphincter tone. (A.R. at 274). The report concluded that Plaintiff "look[ed] well clinically, naïve to [antiretroviral therapy] although [diagnosed] since 1989, has never been in care." (A.R. at 275). Dr. Berkowitz ordered comprehensive blood work that day and stated that treatment would continue with multivitamins.

6

(A.R. at 275). It also stated, without elaboration, "Depression – Refer M[ental]H[ealth]." (A.R. at 275).

A progress note from the Path Center dated March 24, 2011, noted that Plaintiff "denie[d] any new medical complaints," had improved eye photophobia, had been "re-treated" with steroids, and had an "ok" appetite with no weight loss. (A.R. at 276). Test results showed a CD4 count of 189 and no recorded viral burden.[3] The note further stated that Plaintiff had been "in denial" regarding his HIV positivity. (A.R. at 279). Doctor Berkowitz prescribed Atripla, an antiretroviral medication, to treat his HIV, and Bactrium, an antibiotic, to treat pneumonia. He also diagnosed Uveitis and "restarted" steroid treatment. Thus, based on Dr. Berkowtiz's notes, it appears that Plaintiff was HIV positive for decades and first received antiretroviral treatment in March of 2011. It also appears that Plaintiff suffered from pneumonia on that date.

Plaintiff returned to the Path Center for a checkup on April 5, 2011, just prior to his SSI application. He responded well to treatment and denied any new medical complaints. (A.R. at 281). In particular, he denied headaches, neck stiffness, fevers, or chills. His appetite decreased

---

[3] The HIV virus uses immune system cells called "CD4 cells" or "T-cells" to make copies of itself and destroys these cells in the process. A normal CD4 count is between 500 and 1,600 cells per cubic millimeter of blood ("cc/mm3"). See http://www.cdc.gov/hiv/basics/whatishiv.html (last visited August 3, 2016). A person whose CD4 cell count falls below 200 cells/mm3 is considered to have progressed to AIDS. And AIDS diagnosis can also occur if a person develops one or more opportunistic illnesses, regardless of the CD4 count. See http://www.cdc.gov/hiv/basics/whatishiv.html (last visited August 3, 2016).
    The U.S. Department of Health and Human services suggests starting treatment when the CD4 count falls below 350 cells/mm3 because opportunistic diseases typically begin to affect people at that level. See http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/ (last visited August 3, 2016).
    The CD4 percentage, on the other hand, measures how many of the body's white blood cells are actually CD4 cells. The percentage provides a more stable count over a long period of time, but the CD4 count is typically a better measure of immune function. See http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/types-of-lab-tests/index.html (last visited August 3, 2016).

and he lost four pounds since starting Atripla, for which adherence was "perfect." (A.R. at 281). His CD4 count remained at 189 (16%), and his viral burden was recorded as "61200."[4]

Plaintiff again returned to the Path Center for checkup on April 21, 2011. He again denied new complaints, stiffness, fever, or chills. (A.R. at 285). His appetite was again "OK" and he had no recent weight loss, no rashes, and no dizziness or nightmares. (A.R. at 285). Plaintiff "look[ed] well clinically on Atripla" and "ha[d] a nice virologic response." He was on a steroid and a pupil dilator for his uveitis. (A.R. at 287). His CD4 count had risen to 220 (22%), and his viral burden had plummeted to 990. (A.R. at 285).

At a May 26, 2011 Path Center visit, Plaintiff again denied new complaints and still "looked well" with a "nice virologic response." (A.R. 287-89). ). His CD4 count and viral burden had the same recording. (A.R. at 287).

Plaintiff's next documented visit to the Path Center was on September 8, 2011. Plaintiff complained of "chronic fatigue," said that he was depressed, had no new weight loss and had an "OK" appetite. (A.R. at 344). With respect to HIV, he continued to "look[] well clinically on Atripla," and his "CD4 [was] improving (333 25%) with excellent virologic suppression (<20 copies)." (A.R. at 344-45). His past decreased appetite was noted, which had improved after a prescription of an appetite stimulant, megestrol acetate. (A.R. at 345). During a visit the following month, Plaintiff denied any new complaints, continued to express feelings of depression, had an "ok" appetite," and had gained two pounds since the last visit. (A.R. at 347). His CD4 count lowered some to 219, and his viral burden registered at 70. (A.R. at 347-49). His uveitis had been "resolved." (A.R. at 345). Notes from a November 22 visit reflect that

---

[4] In the context of HIV infection, "viral burden" or "viral load" measures the level of HIV in the blood. This measurement helps physicians monitor the disease, decide when to start treatment, and determine whether HIV medications are working. The goal of HIV treatment is to help reduce viral load, ideally to undetectable levels. See http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/viral-load/ (last visited August 3, 2016).

Plaintiff was "not depressed today," gained four more pounds, and had an improved CD4 count of 80 and a lowered viral burden of 30. (A.R. at 351). His Uveitis remained "resolved." (A.R. at 352).

During a Path Center visit in January of 2012, Plaintiff complained of flatulence and constipation but denied abdominal pains. His appetite decreased and he had lost five pounds. (A.R. at 354-56). He looked clinically well and had a CD4 count of 303 and a viral burden of 80. (A.R. at 354). He was prescribed Bisacodyl for constipation and advised to increase fiber and water intake. (A.R. at 356). One month later, in February of 2012, he had "no more constipation," had gained nine pounds since his last visit, and had a CD4 count of 303 with a viral burden of 80. (A.R. at 359). The doctor's notes reflected that recent measures likely resulted from less than perfect adherence. (A.R. at 361).

In April of 2012, Plaintiff complained of numbness in his arm but denied any "weakness" and had no slurred speech "or other associated neurological symptoms." (A.R. at 364). His appetite was "alright" and his weight was stable at 170 pounds. (A.R. at 364). His CD4 count remained at 303 and his viral burden dropped to 60. (A.R. at 365). He looked "clinically well" on Atripla but had missed three doses of his medication. (A.R. at 365).

On June 5, 2012, Plaintiff had his annual examination at the Path Center. He denied experiencing fevers, chills, and nightsweats, though he experienced discomfort swallowing some solid foods. (A.R. at 368). His appetite was "fine" and he had gained four pounds since April. (A.R. at 368). Review of his systems and physical examination had no negative results. (A.R. at 369-71). His appetite was listed as "good," his sleeping habits as "7-8 hours," and "Depression" was marked "no." (A.R. at 371). His CD4 count was at 303 and viral burden at 80. (A.R. at 371).

During a checkup at the Path Center six months later, in December of 2012, Plaintiff complained of experiencing blurry vision several times a week, reported a steady appetite despite having lost 8 pounds in the interim, and continued to "look well clinically" with a CD4 count of 385 and a viral burden of 220, which the doctor deemed "low but increased" from his last visit in June. (A.R. at 377-78).

Finally, lab results, apparently ordered by Dr. Berkowitz at the Path Center, show an increased CD4 count of 486 in January of 2013. (A.R. at 395). No viral burden is recorded or referenced.[5]

Consultative and Administrative Evaluations

On June 23, 2011 Plaintiff underwent a consultative psychological evaluation by Michael Alexander, Ph.D., a psychologist. Dr. Alexander noted no hospitalizations for medical health issues. (A.R. at 291). He described Plaintiff as cooperative, friendly, and alert. (A.R. at 292). Plaintiff appeared well-groomed with normal gait, posture, motor behavior, and eye contact. (A.R. at 292). His expressive and receptive language was adequate, and he appeared "coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the exam." (A.R. at 292). His affect was of normal range and appropriate, his mood was neutral, and his attention, concentration, and memory skills were "intact." (A.R. at 292).

His cognitive function was deemed "average," his insight "good," and his judgment "good." (A.R. at 293). The report states that he "is able to cook, clean, shop, manage his own money, and does take public transportation independently." (A.R. at 293). The report made a

---

[5] A "lab tracker" report dated January 23, 2013 (just prior to the hearing before the ALJ), summarizes a visit to provider "Sangeet" for a "Psychiatry Initial Notice." (A.R. at 394). It states that Plaintiff "reports feeling depressed for the past 5 months . . . gets stressed easily and at times can smoke up to 3 packs a day, appetite is poor but improving." (A.R. at 394). The report ended with a diagnosis of "major depressive disorder" and noted "start" of a prescription of both Zoloft and Seroquel. (A.R. at 394). This report appears to document the psychiatric visit to "Dr. Kahn" about which plaintiff briefly testified before the ALJ. (See page 5, supra).

10

prognosis of "good" and a recommendation that Plaintiff "may benefit from individual psychotherapy for depressed mood." (A.R. at 294). It concluded with the following source statement:

> [Plaintiff] can follow and understand simple directions. He can perform simple tasks independently. He can maintain attention and concentration. He can maintain a regular schedule. He can learn new tasks. He can perform more complex tasks independently. He can make appropriate decisions. He can relate adequately with others. He can appropriately deal with stress.
>
> The results of the examination appear to be consistent with both psychiatric as well as substance abuse problems which do not significantly interfere with the claimant's ability to function on a daily basis.

(A.R. at 293-94). Presumably reviewing that report and the surrounding record, L. Meade, a non-examining state agency psychology consultant, concluded on July 1, 2011 that Plaintiff had no severe mental impairment. (A.R. at 296-309).

Expert Testimony – Dr. Bernard Gussoff

Dr. Gussoff, a certified internist, hematologist, and oncologist, testified that Plaintiff has a documented "HIV positivity" but not AIDS, considering his recent CD4 counts, which were "somewhat suppressed, but certainly not at a low level." (A.R. at 45). He also noted Plaintiff's low viral loads, emphasizing that the measure had been reduced to as low as 70, whereas "viral loads of active disease [AIDS] are in six digits, like 100,000." (A.R. at 48). Thus, he testified that he did not consider labeling Plaintiff as suffering from AIDS an accurate depiction due an absence of cytomegalic episodes, pneumonitis, "or other hematologic or other systemic infectious problems." (A.R. at 45).[6] Dr. Gussoff opined that plaintiff's impairments did not

---

[6] Dr. Gussoff also stated "we have a CD4 of 1220 here, which is just about normal." (A.R. at 45). After reviewing the record, the Court finds no documented CD4 count of 1220. The Court therefore assumes in Plaintiff's favor that this is a typographical error and a reference to Plaintiff's various CD4 counts of "220."

11

meet any of the required listings and that he was capable of performing exertional work at sedentary level and "even ... light work" because he lacked any musculoskeletal, spinal, or similar problems. (A.R. 46-47). He acknowledged two episodes of pneumonia in "the past," prior to Plaintiff's March 2011 antiretroviral treatment and SSI application. (A.R. at 46)

When questioned by counsel about Plaintiff's claims of chronic fatigue, Dr. Gussoff stated that he found no clinical basis for concluding that fatigue resulted from Plaintiff's HIV in the record. (A.R. at 50-52). When questioned about memory loss, he stated the same. (A.R. at 53). With respect to Plaintiff's weight loss and gain, he acknowledged some fluctuation but emphasized an absence of "straight-line descent" or, in other terms, loss of at least 10 percent of his body weight. (A.R. at 55).

## III. DISCUSSION

### A. Standard of Review

In reviewing the ALJ's decision, "it is not [this Court's] function to determine de novo whether plaintiff is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (internal quotation marks and citation omitted). "Rather, [this Court] must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." Id. (internal quotation marks and citation omitted); accord Jordan v. Comm'r of Social Security, 194 Fed. App'x 59, 61 (2d Cir. 2006) ("We review the agency's final decision to determine, first, whether the correct legal standards were applied and, second, whether substantial evidence supports the decision.") (internal citation omitted); see also 42 U.S.C. § 405(g). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Schaal, 134 F.3d at 501 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted);

accord Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). "To determine whether the [ALJ's] findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (internal quotations marks and citation omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

### B.      Analysis for Disability Determinations

The Social Security regulations "establish a five-step process" pursuant to which "the Commissioner is required to evaluate a claim for disability benefits." Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); accord 20 C.F.R. § 404.1520 (codifying the five-step analytical framework). The process is one of sequential evaluation, such that if the Commissioner is able to make a specified conclusive determination regarding the claimant's disability at a given step, there is no need to perform the analysis set forth under the next successive step. See 20 C.F.R. § 404.1520(4).

At step one, a claimant's work activity is considered. See 20 C.F.R. § 404.1520(4)(i). A finding of "not disabled" is warranted if the claimant is engaged in substantial gainful activity. See id.; accord Draegert, 311 F.3d at 472. If the claimant is not engaged in substantial gainful activity, the analysis proceeds to step two, at which the medical severity of the claimant's impairments is evaluated. See 20 C.F.R. § 404.1520(4)(ii); accord DeChirico v. Callahan, 134 F.3d 1177, 1179 (2d Cir. 1998). If the claimant is found to suffer from a severe impairment or combination of impairments that is severe, the third step of the inquiry is performed to determine whether the claimant has an impairment or impairments that meet or equal the criteria listed in

Appendix 1 to Subpart P of Part 404, Title 20 of the Code of Federal Regulations (the "Listings"). See 20 C.F.R. § 404.1520(4)(iii); DeChirico, 134 F.3d at 1179-80. A finding of "disabled" must be made if all criteria for a listed impairment are met. See id. If the claimant's impairment or impairments cannot be equated with at least one of the impairments listed in Appendix 1, the analysis continues.

Before step four is performed, however, an assessment of the claimant's residual functional capacity ("RFC") is made. See 20 C.F.R, § 404.1520(4). This assessment is then used at both steps four and five. See id. At step four of the analysis, the claimant's ability to perform her past relevant work is evaluated; if the claimant is found to possess the RFC to perform such work, she is deemed "not disabled." See 20 C.F.R. § 404.1520(4)(iv); DeChirico, 134 F.3d at 1180.

Otherwise, the analysis proceeds to the fifth and last step, at which the Commissioner "consider[s][her] assessment of [the claimant's] residual functional capacity and [the claimant's] age, education, and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(4)(v); accord 20 C.F.R. § 404.1560(c)(1); DeChirico, 134 F.3d at 1180. At this final step of the analysis, "the ALJ is required to consult with a vocational expert" if "a claimant has nonexertional limitations that significantly limit the range of work permitted by his exertional limitations." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986)). If the claimant is found to possess the residual functional capacity to perform other work that exists in significant numbers in the national economy, a finding of "not disabled" is made; otherwise, a finding of "disabled" is made. See 20 C.F.R. § 404.1560(c); see also 20 C.F.R. § 404.1520(4)(v). "The claimant bears the burden of proof as to the first four steps, while the Commissioner must prove the final one." DeChirico, 134 F.3d at 1180 (internal citation omitted); accord 20 C.F.R. § 404.1560(c)(2) ("In order to

support a finding that you are not disabled at [the] fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors.")

C. ALJ Decision

On March 29, 2013 ALJ Vecchio issued a decision denying Plaintiff's application for SSI benefits. (A.R. at 12-20). Applying the five-step sequential evaluation process, the ALJ found at step one that Plaintiff "has not engaged in substantial gainful activity since April 15, 2011, the alleged onset date." (A.R. at 15). Proceeding to step two, the ALJ concluded that Plaintiff had "one severe impairment: asymptomatic human deficiency infection ('AHIV')." (A.R. at 15). The ALJ found that Plaintiff's depression, vision problems, and other complaints were non-severe because, considered individually and in combination, they did not cause more than minimal limitation in his ability to perform basic work activities. (A.R. at 15-18). With respect to Plaintiff's depression, the ALJ found the impairment less than severe in light of Dr. Alexander's examination, Dr. Meade's assessment, the inconsistencies in Plaintiff's statements, lack of objective support for Plaintiff's account, and the absence of episodes set forth in Listing 12.00(C)(4). (A.R. at 13-17).

At step three of the analysis, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (A.R. 16). The ALJ next determined that Plaintiff had the RFC to perform the "full range of sedentary work as defined in 20 CFR 416.967(a)." (A.R. at 17).[7] In making the above findings, the ALJ emphasized the

---

[7] This capacity was narrower than that opined by Dr. Gussoff, who stated that Plaintiff could perform "light work." (A.R. 46-47).

inconsistencies in Plaintiff's accounts, that expert testimony and consultative review was not controverted by medical evidence, and that "no medical source has indicated that the [plaintiff] has limitations more severe than those included in [the ALJ's] residual capacity finding." (A.R. at 19).

The ALJ also proceeded to step five, essentially skipping step four in Plaintiff's favor because Plaintiff had no recent former employment or transferrable skills, and found with reference to the Medical-Vocational Guidelines (the "Guidelines") that other jobs existed in significant numbers in the national economy that Plaintiff could perform, given his age, education, work experience, and residual functional capacity. (A.R. at 19).

The ALJ also considered Plaintiff's testimony at the hearing that he was unable to work due to other conditions, including troubled eyesight, "locking" hand issues, headaches, "bad memory," and depression. (A.R. at 19). As to Plaintiff's depression, the ALJ noted that Plaintiff had not sought psychiatric treatment before the eve of his hearing, Dr. Alexander's and Dr. Meade's psychological assessments, and Plaintiff's intermittent denial of depression or psychological problems while receiving treatment at the Path Center. (A.R. at 16-19). As to Plaintiff's eye problems, the ALJ emphasized Dr. Gussoff's testimony that he was not significantly impaired and the fact that Plaintiff's treating records documented progress with that issue. (A.R. at 17-19).

The Court is satisfied that the ALJ applied the correct legal principles in his decision. He stated and applied the five-step evaluation, citing to the relevant regulations setting forth that process. The ALJ then thoroughly discussed the regulations relevant to each step before determining that Plaintiff was not disabled within the meaning of the Act at step five. Substantial evidence supports the ALJ's finding at each step.

At step two, substantial evidence supported the ALJ's finding that HIV was Plaintiff's only severe impairment. Consultative examinations concluded that Plaintiff's depression was not limiting and no records or opinions from treating physicians counsel otherwise. Plaintiff's eye problems—originally listed as cytomegalovirus and later as uveitis—were deemed "resolved" by Plaintiff's treating physician and, as Dr. Berkowitz noted, his vision was diminished but far from being impaired enough to meet relevant listings.

Regarding step three, the ALJ correctly found that no medical evidence in the record indicates that Plaintiff met or equaled the listings for HIV at 14.08, which require among other things that a claimant have specific infections, neoplasms, skin and membrane conditions, encephalopathy, or ten percent weight loss combined with specified month-long symptoms. 20 C.F.R. Subpart P, Part 404, Section 14.08. Likewise, his finding that Plaintiff was able to perform a full range of sedentary work was supported by the consultative testimony, records from Plaintiff's treating physician, and the record as a whole. Having made this RFC, the ALJ then properly applied the Guidelines.

Plaintiff's arguments to the contrary are without merit. Plaintiff primarily argues (i) that Dr. Gussoff's testimony was based on considerations impermissibly limited in scope, (ii) that Dr. Gussoff's testimony disclosed mistakes and conclusory statements that are not reliable, and (iii) that the ALJ was required to call a vocational expert. (ECF No. 15).

The first two arguments mischaracterize Dr. Gussoff's testimony. Plaintiff contends that the doctor based his opinion on only a portion of record and did not consider Plaintiff's hearing testimony concerning his fatigue. (ECF No. 15 at 7). Plaintiff argues that this is evident in the doctor's testimony that "he was only going by the written file and not the testimony." (ECF No. 15 at 7). To the contrary, Dr. Gustoff acknowledged at the hearing that Plaintiff had "testimonially" evidenced his fatigue, but the doctor nevertheless concluded that any attribution

17

of fatigue to Plaintiff's HIV would be unsupported by medical evidence. (A.R. at 50-51). Likewise, Plaintiff's claims that Dr. Gustoff improperly focused on limited portions of the record and thereby failed to properly determine whether Plaintiff met the requirements for Section 14.08 of the Listings, (ECF No. 15 at 7), is plainly contradicted by the record. The Doctor expressly acknowledged fluctuations in CD4 counts and viral loads over time, and simply emphasized moderate counts made at particular times. (A.R. at 48 (acknowledging that CD4 counts "fluctuate . . . like any laboratory parameter."); A.R. at 50 (Plaintiff's viral load was "70, another occasion, 220.")) In any event, such general "recurrence" of symptoms and fluctuation of measures does not, without more, meet the relevant listings, established limitations, otherwise lead to a finding of disability.

Plaintiff's second argument, that Dr. Gussoff made errors and conclusory remarks, also ignores the context of the doctor's statements. Dr. Gussoff's statements that Plaintiff had "no infections" were clearly made in discussion of whether Plaintiff's antiretroviral medication, Atripla, was successful treatment, and not an assertion that Plaintiff had never experienced infections prior to that treatment. (See A.R. at 48-49). In any event, that Plaintiff twice had pneumonia during the relevant time frame—assuming this much appeared in the record—would not change the analysis at step three because there is no indication that the pneumonia was "resistant to treatment or require[d] hospitalization or intravenous treatment three or more times in a 12-month period" or otherwise met or equaled the Listings. 20 C.F.R. Subpart P, Part 404, Section 14.08. Likewise, Dr. Gussoff's statement that "I'm no authority on AIDS" was immediately followed by "but I've dealt with many cases" and appears, when read in context, to be nothing more than a statement of humility prefacing his disagreement with other doctors who would opine that Plaintiff's antiretroviral treatment was unsuccessful. (A.R. at 48-49). Self-effacing aside, Dr. Gussoff's view that Plaintiff's treatment was successful remains supported by

substantial medical evidence. Indeed, Plaintiff's treating physician, Dr. Berkowitz, routinely stated that he "look[ed] well clinically on Atripla," and nothing in the record beyond Plaintiff's uncorroborated testimony suggests otherwise. (See, e.g., A.R. at 285, 287, 365, 377-78).

Finally, Plaintiff's contention that the ALJ was obligated to call a vocational expert is essentially an oblique challenge his RFC finding. That is, it rests on the assertion that Plaintiff has more limitations than the ALJ found. As clearly stated in the case on which Plaintiff relies for this point, the Guidelines are properly referenced where "a plaintiff has the capacity to perform a full range of sedentary work," and not "[w]here plaintiff cannot perform a full range of sedentary work, [in which case] she must be evaluated on an individual basis rather than by a mechanical application of the grid rules." *Gonzalez v. Barnhart*, 491 F. Supp. 2d 329, 337-38 (W.D.N.Y. 2007). Here, however, the ALJ's RFC rested on ample record evidence. Indeed, none of Plaintiff's treating physicians suggested he had any notable limitations.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that the ALJ applied the correct legal principles in making his determination and that the determination was supported by substantial evidence. Accordingly, Commissioner's motion for judgment on the pleadings (ECF No. 13) is **GRANTED** and this action is dismissed. The Clerk of Court is directed to enter judgment in favor of the defendant and to close this case.

**SO ORDERED.**

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: August 11, 2017
Brooklyn, New York